# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 95-20265
_____

**NEW PROCESS STEEL CORPORATION,**

**Plaintiff-Appellant,**

**versus**

**SEABOARD SURETY COMPANY,**

**Defendant-Appellee.**

_____

### Appeal from the United States District Court
### for the Southern District of Texas
### (CA-H-92-0912)
_____

July 26, 1996

Before POLITZ, Chief Judge, JONES and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

In this Texas diversity action concerning a commercial crime insurance policy, the primary issue is the standard for when the insured, New Process Steel Corporation, "had knowledge" of its employee's dishonest acts. New Process challenges the jury interrogatory pertaining to this issue and the entry of judgment in favor of Seaboard Surety Company based on the unclear verdict resulting from the jury's interrogatory answers; Seaboard challenges the sufficiency of the evidence that the employee acted with the requisite manifest intent to cause New Process to sustain

_____

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

a loss and to obtain a financial benefit for several New Process customers. We **VACATE and REMAND**.

I.

Under the Seaboard $500,000 policy, New Process was insured for "dishonest acts committed by an 'employee', ... with the manifest intent to ... (1) [c]ause [New Process] to sustain loss; and also (2) [o]btain financial benefit ... for ... (a) [t]he 'employee' ... or (b) [a]ny person or organization intended by the 'employee' to receive that benefit." Of key importance to this case, the insurance was canceled as to that employee "[i]mmediately upon discovery by [New Process] ... of any dishonest act committed by" him; and, toward that end, New Process was required to "notify [Seaboard] as soon as possible" after it "discover[ed] a loss or a situation that may result in loss". Except as to the employee reported for dishonest acts, the policy otherwise remained in effect.

New Process claims that, unknown to it, its employee, Watts, engaged in dishonest acts, to include manipulation of accounts receivable and payment records, for at least three years; and that it did not discover his dishonest acts until January 1991. Then, it promptly notified Seaboard.

After its timely claim was denied, New Process filed this action in Texas state court for, *inter alia*, breach of contract. Following removal by Seaboard, the district court granted it partial summary judgment on the contract claim, concluding that Watts did not act with the requisite manifest intent. Seaboard was

2

later granted summary judgment on the remaining claims. Our court affirmed as to all but the contract claim, holding that, for it, a material fact issue existed as to manifest intent. *New Process Steel Corp. v. Seaboard Surety Co.*, No. 93-2648 (5th Cir. May 4, 1994) (unpublished).

Following remand, a three-day jury trial was held. Seaboard's first five proposed jury interrogatories were adopted almost verbatim; New Process objected only to the fifth. The first asked whether Watts acted with manifest intent to cause a loss to New Process under the policy; the second, later omitted by agreement of the parties due to lack of evidence, whether Watts acted with manifest intent to obtain financial benefit for himself; and the third, whether he so acted to obtain a financial benefit for four identified customers. In the fourth, the jury was to state the loss New Process sustained as to each of those customers.

As noted, New Process objected to number five, which asked whether it "*had knowledge* that Mr. Watts was manipulating the account receivable records", and, if so, when. (Emphasis added.) Its objection had two bases: first, that the interrogatory presented an incorrect standard for "had knowledge"; and, second, that the interrogatory did not ask the jury to determine the amount of loss as at the date it found that the insurance was canceled as to Watts due to New Process' knowledge of his dishonest acts, if it found a date earlier than that claimed by New Process (January 1991). The district court overruled the objection.

3

The jury found that Watts committed dishonest acts with the requisite manifest intent to cause New Process a loss and to obtain a financial benefit for four customers, causing a loss of $653,503. But, in response to interrogatory five, the jury found that, as at June 30, 1989, New Process had knowledge of the accounts receivable manipulations; this date is approximately 19 months earlier than the discovery date claimed by New Process.

The district court was left to enter judgment on this unclear verdict, which, in sum, found that Watts caused a covered loss, but that the insurance as to him canceled far earlier than the date claimed by New Process. Among other things, the loss amount had not been apportioned for that earlier date. Both parties moved for judgment.

After a hearing, the court noted that the policy required New Process to give notice "as soon as possible" upon "discover[ing] a loss or a situation that may result in loss"; and that, although the jury found that New Process discovered in June 1989 a situation that might result in a loss, the requisite notice was not given until January 1991. The court ruled that compliance with the prompt notice provision was a condition precedent and, accordingly, entered judgment for Seaboard. (Seaboard does not urge this as an alternative basis for affirmance. Instead, it asserts that the court found that New Process did not sustain a loss prior to June 30, 1989. But, although the court did state that both parties agreed that discovery by New Process of misconduct would result in immediate cancellation of the insurance and that, as a result, its

4

recovery would be its loss as at the discovery date, it did not rule that all of the loss occurred after that date. To the contrary, while the court noted that Seaboard urged that all of the loss found by the jury occurred after June 30, 1989, the court encouraged Seaboard to attempt to calculate an amount of loss as at that date, which could form the basis for settlement negotiations.) New Process' subsequent motions for judgment as a matter of law and attorney's fees were denied.

## II.

We address whether interrogatory five constituted reversible error; whether the jury's findings on manifest intent to cause a loss and to benefit a third party were supported by sufficient evidence; and whether, if remand is required, all issues must be retried. No authority need be cited for the requirement that, in this diversity action, we apply Texas substantive law.

## A.

As noted, New Process objected to interrogatory five on two bases: incorrect standard for "had knowledge"; and failure of Seaboard to propose an alternative discovery date and apportionment of loss if New Process "had knowledge" earlier than January 1991. These two points form the linchpin to this appeal; we review them *de novo*. **Vero Group v. ISS-Int'l Serv. Sys.**, 971 F.2d 1178, 1181 (5th Cir. 1992). New Process also claims for the first time on appeal that the interrogatory improperly stated what constituted dishonest acts; we review this belated third challenge only for plain error, as discussed *infra*.

5

Concerning the two challenges at hand that were also preserved at trial, "[r]eversal is ... appropriate whenever the charge 'as a whole, leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" ***Bender v. Brumley***, 1 F.3d 271, 276 (5th Cir. 1993) (citations omitted). On the other hand, "[e]ven though error may have occurred, 'we will not reverse if we find, based upon the record, that the challenged instruction could not have affected the outcome of the case.'" ***Id.*** In making that call, "[t]he Supreme Court has advised that 'if one cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that [New Process'] substantial rights were not affected.'" ***Id***. at 279 (quoting ***Kotteakos v. United States***, 328 U.S. 750, 765 (1946)).

1.

A critical issue is when New Process discovered Watts' dishonest acts; unfortunately, the policy does not define "discovery". That term and "had knowledge" were used interchangeably by the district court, and New Process challenges the interrogatory's three definitions for "had knowledge". It, with the jury's answers, provided:

> The burden of proof is on Seaboard with respect to this special interrogatory.
>
> The term "had knowledge" means [first,] that New Process Steel had acquired knowledge of facts from which one might reasonably have concluded that Mr. Watts was committing dishonest acts or [second,] that New Process

6

Steel had knowledge sufficient to alert a reasonably prudent person that dishonest acts were being committed by Mr. Watts or [third,] that New Process Steel had reasonable cause or opportunity to know that there had been dishonest acts committed by Mr. Watts.

Do you find by a preponderance of the evidence that any of New Process Steel's officers or directors had knowledge that Mr. Watts was manipulating the account receivable records of New Process Steel? Yes _X_ No ___. If your answer is "yes," state the date that New Process Steel or any of New Process Steel's officers or directors had knowledge of Mr. Watts' actions. ___6/30/89___.

As noted, this interrogatory was adopted verbatim as submitted by Seaboard, which cited supporting authorities.

a.

For the first definition of "had knowledge" -- "had acquired knowledge of facts from which one might reasonably have concluded that Mr. Watts was committing dishonest acts" -- Seaboard cited to the district court *City State Bank in Wellington v. United States Fidelity & Guar. Co.*, 778 F.2d 1103, 1108 (5th Cir. 1985). This definition is part of a sentence from *Wellington* that, when read alone, seems to state the standard in Texas for knowledge of dishonest acts: "Texas law ... requires only that [the insured] had knowledge of facts from which he could have reasonably inferred that [the employee] had acted dishonestly." *Id.* at 1108.

This quote, however, is from the second part of a sentence stating that the language simply paraphrases a statement from *Fidelity & Casualty Co. v. Central Bank*, 672 S.W.2d 641 (Tex. App.--Houston 1984, *writ ref'd n.r.e.*). Following this quoted language,

7

*Wellington* explains that this paraphrase is misleading with regard to the proper standard for knowledge:

> These statements, when read alone, might lead to the concern that the district court required [the insured] to act on mere suspicion. However, when the opinion is read as a whole, it appears that the district court, consistent with *Central Bank of Houston*, noted the facts in evidence and drew conclusions regarding [the insured's] knowledge based on the evidence and the court's observance of the witnesses.

*Wellington*, 778 F.2d at 1108.

*Wellington* was a bench trial in which the court found that the insured had actual knowledge of the employee's dishonest acts, and the analysis turned on this actual knowledge. In *Wellington*, the bank president, Long, engaged in "draft kiting" by signing the name of a principal stockholder, director, and officer of the bank, Diamond, on promissory notes in a scheme to funnel money to a business for which both persons were directors. *Id.* at 1104-06. The court concluded that the bank's coverage canceled due to Diamond's knowledge of Long's dishonest acts. *Id.* at 1106-07. In that regard, the district court concluded: "Crucial to the resolution of this case, however, is whether Diamond knew that Long was sending money to [their company] from [the bank] over Diamond's signature. The answer can only be yes." *Id.* at 1108. It concluded further: "If Diamond did not know, it is only because he deliberately closed his eyes, an act sufficient to charge him with knowledge." *Id.* at 1107.

8

In denying the bank's motion for a new trial, the *Wellington* district court, paraphrasing the Texas appellate court opinion in *Central Bank*, stated: "'Texas law ... requires only that Diamond had knowledge of facts from which he could have reasonably inferred that Long had acted dishonestly.'" *Id.* at 1108. In *Central Bank*, the bank knew that its employee did not disclose to it his interest in a company and was a member of the bank committee that approved loans to it. 672 S.W.2d at 644. At issue was "whether [the employee's] involvement with the approval of the loans to [the borrower company], while not disclosing his trading partnership with [that company] constitutes a dishonest act under the meaning ... of the bond". *Id.* at 644-45. The Texas court concluded that, from the bank's knowledge of the facts underlying the employee's conduct, it "could reasonably infer that [the employee] had acted dishonestly in connection with the ... loans". *Id.* at 645.

Our court held in *Wellington* that "the district court *adopted* a legal standard fully consistent with the jurisprudence in this area", 778 F.2d at 1109 (emphasis added), in that, as quoted above, it "drew conclusions regarding Diamond's knowledge based on the evidence and the court's observance of the witnesses." *Id.* at 1108. In that regard, our court cautioned that "the cases indicate that the insured cannot be required to act on 'mere suspicion' and that the insured's subjective knowledge should at least be considered." *Id.* at 1108. This is consistent with the much earlier holding by the Supreme Court of the United States that, for such policies, notice is not required unless the insured "had

9

knowledge -- not simply suspicion -- of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty." *American Sur. Co. v. Pauly*, 170 U.S. 133, 147 (1898).

When it objected to the interrogatory, New Process quoted a standard for "had knowledge" from another opinion by our court, which relied upon *Pauly*:

> The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice "until he [has] acquired knowledge of some specific fraudulent or dishonest act which might involve the [Insurer] in liability for the misconduct." *Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing.*

*FDIC v. Aetna Casualty & Sur. Co.*, 426 F.2d 729, 739 (5th Cir. 1970) (emphasis added) (citing *Pauly*, 170 U.S. at 147). Accordingly, we conclude that the first definition of "had knowledge" only partially stated Texas law; it was inadequate because, contrary to *Wellington, Aetna,* and *Pauly*, it did not make clear that New Process was not required to act when it "merely suspect[ed] or ha[d] reason to suspect the wrongdoing." *Aetna*, 426 F.2d at 739.

b.

For the second definition of "had knowledge" -- "that New Process ... had knowledge sufficient to *alert* a reasonably prudent person that dishonest acts were being committed" (emphasis added) -- Seaboard cited to the district court *Hidden Splendor Mining Co. v. Gen. Ins. Co.*, 370 F.2d 515 (10th Cir. 1966). But, this

10

definition tracks only a finding by the trial court in **Hidden Splendor**. **Id**. at 518.

For its standard, the Tenth Circuit, citing **Pauly** among other cases, stated: "The test of when one has 'discovered' a fraudulent act is not in dispute -- ... [the insured] was not required to report merely suspicious conduct, but rather only knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty". **Id**. at 517 (citations omitted). In agreeing with the trial court, the Tenth Circuit did conclude that the evidence was "entirely sufficient to alert a reasonably prudent person that a fraud had been committed"; but, it first "agree[d] with the trial court that [the insured] either knew or had reason to believe that [the employee] had committed a fraud". **Id**. at 519.

This second definition, like the first, is incomplete. It takes out of context a conclusion based on specific evidence. Without other qualifying language, as discussed above, it is misleading.

c.

For the third definition of "had knowledge" -- "that New Process Steel had reasonable cause or opportunity to know that there had been dishonest acts committed by Mr. Watts" -- Seaboard cited to the district court **City Loan & Sav. Co. v. Employers' Liability Assurance Corp., Ltd.**, 249 F.Supp. 633, 657 (N.D. Ohio, 1964). As noted, the interrogatory is taken verbatim from Seaboard's submission; but in its brief here, Seaboard does not even cite its source in district court for this "opportunity to

11

know" standard. Instead, it maintains that, "when taken in context, the phrase 'opportunity to know' means that [New Process] had knowledge of facts from which it could reasonably infer that Mr. Watts had committed dishonest acts but failed to reasonably inquire based on that knowledge". Alternatively, it urges that, if we find the inclusion of the "opportunity to know" phrase to be less than a "model of perfection", it is but a "minor imperfection in a charge that is on the whole correct."

As shown earlier, this definition is not supported by Texas law. Moreover, its inclusion may have caused the jury to find that New Process "had knowledge" of Watts' dishonest acts merely because it had reason to suspect them. But, as discussed, "[n]otice is not required when the [insured] merely suspects or has reason to suspect the wrongdoing." *Aetna*, 426 F.2d at 739; *see* ***Wellington***, 778 F.2d at 1108. As ***Wellington*** cautions, "the insured cannot be required to act on 'mere suspicion'". 778 F.2d at 1108. "In determining when an insured is required to give notice, this Court has noted the well-established rule ... that the Insured ... is not bound to give notice until he [has] acquired knowledge of some specific fraudulent or dishonest act." *Id.* at 1107 (internal quotation marks omitted) (quoting *Aetna*, 426 F.2d at 739).

In sum, we conclude that the definition for "had knowledge" constituted reversible error. Therefore, that part of the judgment based on the interrogatory must be vacated and the case remanded, as hereinafter discussed.

12

2.

For its second objection to the interrogatory, New Process urged that it was insufficient (1) because it asked the jury to specify a date on which New Process "had knowledge", but did not require it to apportion loss as at that date; and (2) because Seaboard failed to introduce evidence to allow the jury to make such an apportionment. In overruling the objection for the record, after it had already instructed the jury, the court acknowledged that this "might have muddied the water". We conclude that the interrogatory constituted reversible error for these reasons as well.

Because the jury found a date (June 30, 1989) other than that claimed by New Process (January 1991), the loss apportionment conundrum forecast by New Process was created. Along that line, at the hearing on entry of judgment, the court stated:

> In view of the fact that this case is undoubtedly going to go back to the Fifth Circuit for another couple of hundred thousand dollars in attorney's fees and costs, maybe the sensible thing is for us to admit to each other that you all led me into error in the way you asked me to submit this to the jury.

We agree that the interrogatory submitted by Seaboard had that effect.

The parties dispute who had the burden of proving both the date of cancellation due to discovery of Watts' dishonest acts and the loss as at that date. New Process points out that effective September 1, 1991, art. 21.58 of the Texas Insurance Code was amended to provide as follows:

13

> In any suit to recover under a contract of
> insurance, the insurer has the burden of proof
> as to any avoidance or affirmative defense
> that must be affirmatively pleaded under the
> Texas Rules of Civil Procedure. Any language
> of exclusion in the policy and any exception
> to coverage claimed by the insurer constitutes
> an avoidance or an affirmative defense.

TEX. INS. CODE art. 21.58(b) (Vernon's Supp. 1995).

While "both before and after the amendment, proof that the loss occurred within the policy period is a precondition to coverage and, thus, the insured's responsibility", the insurer has the burden "of proving the applicability of policy exclusions." *New Hampshire Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1199 (5th Cir. 1993) (emphasis omitted); *Love of God Holiness Temple Church v. Union Standard Ins. Co.*, 860 S.W.2d 179, 181 (Tex. App.-- Texarkana 1993, *reh'g denied*). New Process met its loss-within-policy-period burden, as reflected by the jury's answers to interrogatories one, three, and four. And, the jury found a loss of $653,503 as a result of Watts' "dishonest actions".

As stated in interrogatory five, submitted by Seaboard, Seaboard had the burden of proving that the insurance as to Watts canceled (New Process "had knowledge") earlier than the January 1991 date claimed by New Process. But, although its own interrogatory conceded that it had this burden, Seaboard maintains now that New Process had the burden of proving the apportionment of loss necessitated by the jury finding an earlier discovery date than that claimed by New Process. The cancellation clause is, however, an exception or exclusion for which Seaboard bears the pleading and proof burden -- upon discovery of a dishonest act by

14

an employee, the policy remains in effect with the exception that the dishonest employee is no longer covered.

As stated here by New Process, if it had the burden of disproving Seaboard's defense as to coverage for Watts ending earlier than the date claimed by New Process, the result would be untenable: "New Process would have been required to prove the daily amounts of its losses and submit interrogatories and evidence for over 730 days, one for each of the days in 1989 and 1990 on which the jury could have found that New Process had" knowledge of Watts' dishonest acts. In sum, Texas law is consistent with the logical conclusion that Seaboard had the burden to assert and prove a cancellation date as to Watts earlier than that claimed by New Process and to prove the loss as at that earlier date.

3.

Finally, New Process asserts, as noted, for the first time on appeal, that the interrogatory also constituted reversible error because it asked only whether New Process had knowledge that Watts was "manipulating the account receivable records", not whether it had knowledge that he had committed dishonest acts. For starters, the interrogatory must be read as a whole, and must also be read in conjunction with interrogatory one, which, *inter alia*, tracks the policy language and states that "dishonest acts" by the employee are covered, and with interrogatory three.

More important for our purposes, New Process did not object at trial on this basis. Therefore, under FED. R. CIV. P. 51, we review only for plain error, **Highlands Ins. Co. v. Nat'l Union Fire Ins.**

15

*Co.*, 27 F.3d 1027, 1032 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 903 (1995), and, obviously, find none.  On the other hand, this is, of course, a matter to consider in framing the jury instructions and interrogatories on remand.

### B.

As an alternative basis for the judgment, Seaboard contends that, for jury interrogatories one, three, and four, there was insufficient evidence to support the findings that Watts acted with the requisite manifest intent to cause New Process a loss and to benefit a third party.  At the close of the evidence, Seaboard raised this issue in its FED. R. CIV. P. 50(a) motion for judgment as a matter of law.  But, after judgment was entered, it did not renew its sufficiency challenge under Rule 50(b).

The Rule 50(a) motion preserves that challenge; but, because Seaboard did not move under Rule 50(b), it is entitled only to a new trial if its alternative challenge is successful.  *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1315 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 705 (1996); *Zervas v. Faulkner*, 861 F.2d 823, 832 n.9 (5th Cir. 1988); *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 160, 162-63 n.8 (5th Cir. 1985).  In reviewing the evidence, we apply the well known standard -- Seaboard is entitled to relief "if the facts and inferences point so strongly in [its] favor that reasonable [jurors] could not arrive at a contrary verdict." *Trans-World Drilling*, 772 F.2d at 160 (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)(en banc)).

16

1.

Interrogatory one, submitted by Seaboard and unobjected to, provided the following standard for determining whether Watts acted with manifest intent to cause a loss:

> To determine whether Mr. Watts acted with the *manifest intent* to cause a loss to New Process Steel, the inquiry is not solely into Mr. Watts' subjective motive or purpose. The Jury is also allowed to rely upon inferences from tangible manifestations of behavior. The Jury should analyze the range of evidentiary circumstances, including the relationship between the customers and Mr. Watts, Mr. Watt[s'] knowledge of the likelihood that the customer would or would not pay their debts, and all of the other surrounding circumstances bearing on Mr. Watts' purpose. If an employee fraudulently extends credit with reckless disregard for a substantial risk of loss to the company, a jury may infer from that and surrounding circumstances that he intended to cause a loss.

It is beyond question that Watts' actions (making unauthorized shipments of steel, manipulating the records to cover it up, secreting insufficient funds checks, etc.) were dishonest. Watts' videotaped deposition, shown to the jury, indicates clearly that he understood New Process' credit rules and their importance, but intentionally disobeyed them to perpetuate his dishonest acts and hide them from New Process. Testimony by two New Process employees reflects that Watts hid his actions, and Seaboard's expert stated that Watts admitted hiding his account manipulations. New Process' expert on credit management testified that a credit manager, such as Watts, would know not to extend additional credit and ship more product to a company if New Process was not being paid and did not

17

obtain additional security, because this may increase the loss and result in a slim likelihood of recovery.

It was reasonable for the jury to determine that Watts' extensions of credit were fraudulent and were in reckless disregard of a substantial risk of loss to New Process.  Even though Watts claimed that he did not intend to cause any loss to New Process, it was reasonable for the jury to discredit this assertion and to infer from the evidence that Watts intended to do so.

2.

Similarly, interrogatory three, submitted by Seaboard and unobjected to, provided the following standard for determining whether Watts acted with the manifest intent to benefit third parties:

> To determine whether Mr. Watts committed dishonest acts with the *manifest intent* to obtain a financial benefit for [the four specified customers], the inquiry is not solely into Mr. Watts' subjective motive or purpose.  The Jury is also allowed to rely upon inferences from tangible manifestations of behavior.  The Jury should analyze the range of evidentiary circumstances, and all of the other surrounding circumstances bearing on Mr. Watts' purpose.

Watts admitted that he had concerns about whether one of the customers, to which he continually shipped steel despite receiving no payment, would fail to survive as a going entity if he stopped; and that, to a certain extent, he was financing that customer's continuing operation.  His intent to benefit a third party is obvious from his admitted account manipulations to hide shipments of steel which would not have been authorized for the specified

18

four customers.  The evidence is sufficient to support finding a manifest intent to benefit third parties.

3.

Furthermore, sufficient evidence supports the jury's answer to interrogatory four, which was also submitted by Seaboard and unobjected to, concerning the amount of loss as to each of the four customers.  New Process introduced evidence that the total amount of steel lost to the four customers was worth $751,154; and that, excluding a 13% profit, 87% of that figure ($653,503.98) was its cost for the product.  The jury found a loss of $653,503, which comports with the above described calculus.

C.

Although this case must be remanded because of interrogatory five, we need not remand for a new trial on all issues.  "It is well settled that a new trial on part of the issues is properly resorted to if 'it clearly appears that the issue to be retried is so distinct and separate from the others that a trial of it alone may be without injustice.'"  **Westbrook v. Gen. Tire & Rubber Co.**, 754 F.2d 1233, 1242 (5th Cir. 1985) (citing **Gasoline Products Co. v. Champlin Refining Co.**, 283 U.S. 494, 500 (1931), and **Lucas v. American Mfg. Co.**, 630 F.2d 291, 294 (5th Cir. 1980)).  As discussed, the jury found properly that Watts acted with the requisite manifest intent to cause New Process to sustain loss for the benefit of third parties in the amount of $653,503.  These coverage and total loss issues are clearly separable from the two issues of when New Process discovered (had knowledge of) Watts'

19

dishonest acts and the loss as at that date.  Accordingly, "the interests of justice are best served by ... remanding the cause solely for a trial as to" the latter two issues.  *Parker v. Wideman*, 380 F.2d 433, 437 (5th Cir. 1967).

Furthermore, despite the above discussed objections by New Process, Seaboard declined to cure the defects in interrogatory five, which it submitted.  Seaboard is not entitled to subject New Process to a costly retrial on all the issues after New Process has obtained favorable responses from the jury on each interrogatory except number five, to which it objected.  It is "contrary to any concept of judicial economy to provide [Seaboard] a second bite of the apple when any responsibility for confusing the jury must fall at [its] own door." *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 602 n.30 (5th Cir. 1974).

For both of these reasons, we remand for a new trial only (1) as to the date New Process discovered (had knowledge of) Watts' dishonest acts; and (2), if that date is earlier than the January 1991 date claimed by New Process, for an apportionment as at that earlier date of the $653,503 total loss.  The district court may find it appropriate to bifurcate the trial, so that the jury finds first whether New Process had knowledge of Watts' dishonest acts before the January 1991 date; and, if it did, then apportions the total loss.

### III.

For the foregoing reasons, the judgment is **VACATED** and this action is **REMANDED** (1) for a new trial only (a) as to when New

20

Process had knowledge of dishonest acts, and (b), if it had such knowledge prior to the 1991 date claimed by it, its loss out of a total $653,503 as at that earlier date; and (2) for the court to take such other ancillary action as may be appropriate, including the award of attorney's fees.

*VACATED and REMANDED*

21